APPEAL NO. 25-10656-G

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

ANNETTE KINGSOLVER, Plaintiff-Appellant,

v.

U.S. ATTORNEY GENERAL,
U.S. DEPARTMENT OF JUSTICE, and
BUREAU OF ALCOHOL, TOBACCO and FIREARMS,
Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA,
BRUNSWICK DIVISION

---

BRIEF OF PLAINTIFF-APPELLANT
ANNETTE KINGSOLVER

---

Mary Helen Moses
Mary Helen Moses, Esq., LLC
235 Olive Way
St. Simons Island, Georgia 31522
(912) 269-0907

Andrew M. Ruberti
Osteen Law Group
101 Fraser Street
Hinesville, Georgia 31313
(912) 876-0202

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

The following individuals have an interest in the outcome of this case and appeal:

Kingsolver, Annette – Appellant

Moses, Mary Helen – Attorney for Appellant

Ruberti, Andrew M. – Attorney for Appellant


## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 11th Cir. R. 34-3(c), Appellant respectfully requests oral argument.

i

## TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement………………i

Statement Regarding Oral Argument……………………………………………………..i

Table of Citations…………………………………………………………………………...ii

Statement of Subject-Matter and Appellate Jurisdiction……………………….……iv

Statement of the Issues…………………………………………...………………………1

Statement of the Case……………………………………………….……………………1

Summary of the Argument…………………………………………………………...14

Argument and Citation to Authority………………………………………………16

I.    Kingsolver's claims based on the Agency's Denial of her Requests for Reasonable Accommodation are not Time-Barred Because the Agency Failed to Notify her of the Deadline, Failed to Comply with the DOJ's Request Process, and Effectively Waived its Timeliness Argument………………………………………………………..17
      A.    Kingsolver's pre-October 1 requests are not time-barred…,,18
      B.    Equitable tolling should be applied in this case…………….21
II.   Kingsolver's Demotion was Not Voluntary Because the Agency Increased her Work Responsibilities, Gave her a few Hours to Answer, Misrepresented the Availability of Leave Without Pay, and Consistently Refused to Follow the DOJ's Request Procedure…….32
III.  Summary Judgment was Improperly Granted……………………...39

Conclusion………………………………………………………………………….39

Certificate of Compliance…………………………………………………………..42

Certificate of Service………………………………………………………………42

# TABLE OF CITATIONS

CASES

*Abram v. Fulton Cnty. Gov't,* 598 F. App'x 672 (11th Cir. 2015)……………..18, 19

*Adams v. Poag,* 61 F.3d 1537 (11th Cir. 1995)…………………………………13

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)…………………………14

*Billups v. Emeral Coast Utilities Auth.,* 714 F. App'x 929 (11th Cir. 2017) ……..35

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)…………………………………14

*Duckett v. Dunlop Tire Corp.,* 120 F.3d 1222 (11th Cir. 1997)……………………35

*Green v. Brennan,* 578 U.S. 547 (2016)…………………………………………..18

*Hargray v. City of Hallendale,* 57 F.3d 1560 (11th Cir. 1995)……………....16,32-34

*Horsley v. Univ. of Ala.,* 564 Fed. App'x 1006 (11th Cir. 2014)……………….....26

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574…………14

*Morton v. Kirkwood,* 707 F.3d 1276 (11th Cir. 2013)……………………………...39

*Mullin v. Sec'y, Dept of Veterans Affs.,* 2022 WL 2159721
(M.D. Fla. June 15, 2022)…………………………………………………….21

*Stewart v. Happy Herman's Cheshire Bridge,* 117 F.3d 1278 (11th Cir. 1987)……37

*Stone v. Univ. of Md. Medical System Corp.,* 855 F.2d 167 (4th Cir. 1988)……….34

*Tarmas v. Mabus,* 2010 WL 3746636 (M.D. Fla. Sep. 21, 2010)…………...….…21

*Tolbert v. James,* No. 2:13-CV-427-WKW, 2015 WL 2169950
(N.D. Ala. May 8, 2015)……………………………………………………..35

*Walker v. Darby,* 911 F.2d 1573 (11th Cir. 1990)…………………………………14

*Wilson v. Sec'y, Dep't of Veterans Affs.,* No. 20-10799, 2022 WL 1907863
(11th Cir. 2022)……………………………………………………...21-25, 39

*Wood v. Green,* 323 F.3d 1309 (11th Cir. 2003)…………………………….... 35-36

STATUTES

28 U.S.C. § 1291……………………………………………………………..iv

28 U.S.C. § 1331……………………………………………………………..iv

29 U.S.C. § 791…………………………………..4,5, 16, 17, 25, 26, 31, 32, 37, 40

29 U.S.C. § 2612…………………………………………….......4, 5, 28, 36-38

RULES

Fed. R. Civ. P. 56…………………………………………………………..13-14, 39

REGULATIONS

C.F.R. § 1614.10………………………………………………………………7,17

C.F.R. § 1614.105……………………………………………………1,15,18, 20, 21

C.F.R. § 1614.203………………………………………………..………..31

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This case was brought pursuant to the Rehabilitation Act, 29 U.S.C. § 790, *et seq.,* which prohibits federal agencies from employment discrimination against persons with disabilities. As such, it is a federal question, and this Court has jurisdiction pursuant to 28 U.S.C. § 1331. This appeal is from a final order granting summary judgment, and appellate jurisdiction is based on 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

1. Does a federal employer unlawfully fail to accommodate a disabled employee when it does not follow its request procedures in good faith, denies her reasonable accommodation requests based on a misrepresentation, and fails to offer any alternative accommodations?

2. Does the 45-day limitation in 29 C.F.R. § 1614.105(a) operate as an absolute bar to consideration of denials of reasonable accommodation requests where the employee is not notified of the time limit?

3. Is equitable tolling of the 29 C.F.R. § 1614.105(a) 45-day limit appropriate when the employer failed to follow its own procedures and failed to notify the employee of the 45-day limit?

4. Is a disabled employee's acceptance of a demotion voluntary when the employer has altered the terms and conditions of her present position, given her less than 24 hours to decide without the advice of counsel, and misrepresented the availability of alternative accommodations?

**STATEMENT OF THE CASE**

Plaintiff-Appellant Annette Kingsolver ("Kingsolver") was diagnosed with depression and cardiac arrythmia ("CA") in 1993. Dkt. No. 21-5 at 32:11-14, 34:7-18. She began working with the Federal Law Enforcement Training Center ("FLETC") office of the Bureau of Alcohol, Tobacco and Firearms and Explosives

1

("ATF" or "Agency") in 1997 as a contractor; in 1999, she became an employee GS-7 Managements Assistant. Dkt. No. 21-5 at 10:16-25, 11:1-3. From 1999 to 2003, Kingsolver's GS-7 position consisted of various responsibilities mostly related to training. Dkt. No. 21-5 at 10:16-11:22.

In 2003, the Agency changed and increased Kingsolver's work responsibilities. Kingsolver became licensed to work in the ATF's "Financial Resource Desktop System" ("FReD") which tracked expenditures, spending and other financial tasks, and she began performing various budget functions. Dkt. No. 21-5 at 11:3-9, 23:13-19. From 2003 to 2005, her FReD work increased and in 2005, she was officially transferred to the Agency's budget office. Dkt. No. 21-5 at 24:2-5, 13:1-9. Most, if not all, of her job responsibilities with FReD were tasks previously assigned to GS-12 employees. Dkt. No. 21-5 at 58:12-59:6. It is undisputed that Kingsolver's work was rated "outstanding" throughout her tenure at the Agency. In recognition of a desk audit's conclusion that she was working over-grade, Kingsolver was promoted from GS-7 Management Assistant to GS-9 Management Analyst in April 2007 with an increase in pay, but no change or increase in responsibilities. Dkt. No. 21-5 at 11:8-18:3.

A few months before her promotion, Kingsolver was assigned two new supervisors, first-line Abra Lattany-Reed ("Reed") and second-line Thomas Brandon ("Brandon"), both from outside the budget office. Although Kingsolver

2

had not complained, the four years of accumulated stress resulting from the acknowledged operational issues with FReD was affecting her mental and physical health, exacerbating both her depression and CA. Dkt. 21-5 at 24:6-13. The Agency first became aware on April 16, 2007, when supervisor Fuzzy Zellers, a budget office veteran, found Kingsolver in her office crying uncontrollably. Dkt. No. 21-5 at 19:19-21:5. When Zellers questioned her about it, Kingsolver described the stress buildup from working with FReD. Zellers insisted that she report the problem to Reed. Kingsolver agreed, but said specifically she didn't want to be demoted. Zellers reassured her that "the ATF never demotes anyone." Dkt. No. 21-5 at 20:13-24.

Zellers spoke with Brandon, who directed Reed to meet with Kingsolver, ask her about her well-being and advise her of the Agency's Employee Assistance Program ("EAP"). Dkt. No. 21-5 at 22:2-16, 167:9-14. On Friday, April 27, Reed called Kingsolver into her office. Reed, who assumed that Kingsolver was having problems at home, handed her a counseling memo (Dkt. No. 21-8) describing EAP services. Kingsolver explained that work stress was causing her depression and CA. Dkt. No. 21-5 at 24:14-20. Kingsolver made suggestions of things that might reduce her stress - leave without pay ("LWOP"), a transfer to another GS-9 position, or "what else could be done to help me." Dkt. No. 21-5 at 24:18-20. Kingsolver specifically told Reed why she wanted LWOP rather than her accumulated paid leave:

3

> I just told her, you know, my depression was getting worse. I had cardiac arrhythmias. They were getting worse, and I needed – I needed to get away. And I also told her that I had a son that lived in Alaska at the time, and I would like to keep my leave just in case I needed to – something happened I needed to go out there.

Dkt. No. 21-5 at 25:10-17; Dkt. No. 23-5 at 14:8-15:21. Reed immediately refused LWOP, incorrectly claiming that Kingsolver was not eligible until her accumulated sick and annual leave was exhausted. Dkt. No. 21-5 at 24:25-26. Reed did not provide Kingsolver with any information concerning her right to reasonable accommodation under the Rehabilitation Act, 29 U.S.C. § 791, or the procedure in Department of Justice's *Manual and Procedures for Providing Reasonable Accommodation* ("DOJ Manual") (Dkt. No. 23-1 at 102-112) or the Family Medical Leave Act ("FMLA"), both of which suggest LWOP as an option, nor did she refer Kingsolver to the accommodation coordinator or HR. Reed did consult with Brandon, who testified that he attempted to find a GS-9 position within his purview when he first became aware of Kingsolver's health issues. Dkt. No. 21-5 at 307:14-309:9, 309:21-311:13.

After this Friday meeting, Kingsolver was out of the office for three weeks, two for a preplanned vacation followed by a week-long FReD training in Washington, D.C., which she attended with Reed and two other GS-12 co-workers. Dkt. No. 21-5 at 25:8-26:4, 325:2-10. On May 21, her first day back, Reed came to Kingsolver's office to discuss her health issues and accommodations requests.

Kingsolver again asked about LWOP, lateral transfer, and/or "anything else that could be done to help me." Dkt. No. 21-5 at 26:4-27:1. Despite the clear availability of LWOP leave under the Rehab Act, the DOJ Manual and FMLA, Reed again refused LWOP because Kingsolver had accumulated paid leave. Reed reported Brandon's finding that the only transfer option was at grade level GS-7, a demotion. Dkt. No. 21-5 at 27:2-14. Reed offered no suggestions or resources, and did not report Kingsolver's request to anyone within the Agency.

Two days later, Kingsolver had virtually the same conversation with Brandon when he stopped by her office. Kingsolver explained her worsening mental and physical health and asked for a lateral transfer, LWOP, or anything that might help. Brandon's responses were identical to Reed's: no lateral transfer, only demotion to GS-7; no LWOP without exhausting her paid leave; no other suggestions or referrals. Dkt. No. 21-7 at 27:15-30:16. Brandon has admitted that he did not trust Kingsolver's motives:

> Annette was already familiar with FReD (i.e., her explanation for her job stress) when she applied for the GS-9 position. In fact, her FReD and budget knowledge is how she qualified for the higher position within the budget team. *I personally doubt her intentions were ever genuine* … I believe she applied for the GS-9 budget position with the intent of getting higher pay and then trying to transfer to another position within the Academy… I also believe Annette did not like working for [Reed], an African-American female.

Declaration of Thomas E. Brandon (September 6, 2008) [emphasis added]. Dkt. No. 23-1 at 70.

Given the lack of meaningful response from her supervisors ("… it was obvious that they weren't going to help…"), Kingsolver saw both of her treating physicians, Drs. Jones and Moran, at the end of May. Dkt. No. 21-5 at 30:21-22. Each produced a letter describing her mental and physical conditions brought on by stress, and each recommended a review of her job duties. Dkt. No. 21-9, 21-10. Kingsolver submitted both letters to Agency management along with a memorandum dated June 14 again requesting a lateral transfer. Dkt. No. 21-11. Neither Reed nor Brandon reported the submission of these physician letters to the Agency's HR or EEO offices, and did not immediately respond to Kingsolver's memo.

In a June 19 conference call with Reed and Brandon, Kingsolver again explained her worsening physical and mental health and asked for assistance. Rather than complying with the request procedure, Brandon directed Kingsolver to provide him with a list of stressors caused by FReD system. Kingsolver immediately complied. Dkt. No. 21-5 at 37:19-38:10. She did not hear anything from Brandon or Reed for a month, other than Reed's agreement that her stressors memo was valid

On July 13, Brandon and Reed learned that Kingsolver was suffering chest pains at work, had gone to the FLETC health center, and was being sent home for

medical attention. Dkt. 23-1 at 52, 66. Neither reached out to Kingsolver. After she recovered from this episode, on July 19, Kingsolver requested a meeting with both in which she again explained her worsening health and asked for LWOP, a lateral transfer, or "what they could do to help me." Dkt. No. 21-5 at 42:12-50:3. Reed and Brandon only offered a demotion.[1]  They did, however, provide Kingsolver with a DOJ 100A Request for Reasonable Accommodation ("request form") that they had acquired that day, their only reference to the request procedure throughout the process.[2]  They did not provide her any information about the request procedure outlined in the DOJ Manual because, as both Reed and Brandon admitted, they did not know the DOJ Manual existed. Dkt. No. 21-5 at 340:2-12.  They did not know who the accommodation coordinator was.[3] Specifically, they did not advise her that there was any deadline for submitting the request form and never discussed the

---

[1] Brandon admitted that after the first position search in May, he never looked again. Dkt. No. 21-5 at 336:10-23. Thus, he was not actively seeking an alternative for Kingsolver.

[2] Brandon testified that he spoke with Lisa Boykin in Washington, apparently on the day of the July 19 meeting and she supplied him with the request form. He further testified that he did not speak with Boykin again. Dkt. No. 21-5 at 338:16-339:8.

[3] Brandon testified that he didn't think there was a FLETC coordinator; he thought the coordinator was Lisa Boykin in Washington. Dkt. 21-5 at 338:8-25. Likewise, Reed testified that the "reasonable accommodation coordinators is the person in headquarters", *i.e.,* Washington. Dkt. No. 21-5 at 123:16-124:1. Consistent with CFR § 1614.10 and the DOJ Manual, ATF had an accommodation coordinator on site, Dora Silas. Dkt. No. 23-1 at 55; Dkt. No. 23-4

recommended accommodations for depression listed in the DOJ Manual (extended leave, telecommuting, flexible work schedules, and the like, and demotion only as a last-gasp possibility). Dkt. No. 23-1 at 108.

With demotion as the only accommodation Reed and Brandon had offered, Kingsolver asked them about the possibility of new GS-9 management analyst positions coming available on October 1; Brandon confirmed that these were in the works and that Kingsolver could apply. Dkt. No. 21-5 at 306:10-307:1. And, a few days later, Kingsolver was given an office with a window, something she had never requested but that Dr. Moran had mentioned in passing in his letter to management. Dkt. No. 21-10; 21-5 at 331:15-332:8.

On August 16, Kingsolver requested another meeting which followed the same script: she said her health was worsening and she needed help, and Brandon said her only option was the GS-7 position he had identified in May. Brandon again confirmed that there would likely be GS-9 vacancies on October 1; when Kingsolver suggested that she hold off on filing the request form to apply for a new GS-9 position, their response was "Okay. Do that." Dkt. 21-5 at 51:11-16. Neither Brandon nor Reed told Kingsolver that she had to submit the request form within a certain period of time or forfeit her right to accommodation.

For the next six weeks, Kingsolver continued at her budget job during the hectic and stressful end-of-fiscal-year period. Dkt. No. 21-5 at 51:17-52:1.

8

Sometime around Monday, October 1, she learned that the new GS-9 positions had not materialized, so she filled out the request form and asked only for a lateral transfer, and noted, "Work related stress needs to be reduced as quickly as possible." Dkt. No. 21-12. Kingsolver did not ask for LWOP because she "had requested it numerous, numerous times and it was – [Reed] was very adamant and Tom Brandon was too, no, no, no, no." Dkt. No. 21-5 at 54:10-17. She submitted the completed form to Reed, who did not respond and did not report the submission to the EEOC office. Dkt. No. 21-5 at 53:14-17.

Rather, the next communication from Reed two days later was an email which did not address her request for reduction of stress, but *increased* her workload with new, additional FReD duties at the GS-12 level:

> …[W]hen I opened up my e-mail and saw that I was being given additional duties, I just lost it and got very upset, was crying. I was just at – I [was] just at my breaking point…

Dkt. No. 21-5 at 56:16-19. Kingsolver called Reed and said she needed to go home; Reed instructed her to stay and came to her office. Reed said that Brandon was requiring Kingsolver take on *more* duties because she had been promoted to a GS-9 earlier that year; Reed had therefore reassigned duties from a GS-12 employee to Kingsolver. Dkt. No. 23-5 at 46:2-47:1. Kingsolver fell apart:

> I just told her, you know, I couldn't handle any more, my plate was full, and you know, I was just extremely crying very hard, and told her that I, you know, I still asked for leave without pay, I still wanted, you know, a possible transfer, you know, or what they

9

> could do to help. And I told her I needed to go home for the day…I just couldn't remain at work that particular day.

Dkt. No. 21-5 at 57:13-23. Kingsolver saw Dr. Jones that day, who was "adamant" that she must get out of the job:

> He said, Annette, you know I've written you a letter. I'm going to write you another one. Dr. Moran has provided a letter. He said they are not helping you. They're not doing what you need. He said you cannot continue with this amount of stress. You're a candidate for a heart attack ... and ... you just cannot continue with this stress. He said your two choices here, as I see from you, is stay in it or take the demotion which is all they've offered you. He said you have got to take the demotion. He said it is your health. He said … it's very serious.

Dkt. No. 21-5 at 61:1-13. On Thursday, Kingsolver took a sick day and another on Friday, while she met with her ophthalmologist in Jacksonville. Having heard nothing from Reed about her request form, Kingsolver contacted Dora Silas, Deputy Executive Assistant, EEO, and learned [for the first time] that Silas was the Accommodation Coordinator. Silas knew nothing of Kingsolver's struggle: she had not received Kingsolver's physician letters, any information about Kingsolver's verbal requests, nor even the Request form Kingsolver had filed. Dkt. No. 23-1 at 47; Dkt. No. 23-4 at 69:4-70:20.

The office was closed for Columbus Day on Monday, October 8. Kingsolver returned to work on Tuesday, October 9. Dkt. No. 21-5 at 61:16-25. She met with Reed at about 2:30 that afternoon, asking again for LWOP or a lateral transfer and "isn't there something you all can do for me?" Dkt. No. 21-5 at 62:1-11. Reed

10

refused and further warned Kingsolver that the GS-7 position they had identified might not be available so that Kingsolver might have to remain in her GS-9 job with the additional duties. Dkt. No. 21-5 at 63:16-19. Adding further to Kingsolver's stress, Reed gave her a two-hour deadline:

> She said I had to make a decision by the end of the day, that Tom Brandon said I could not come in and pick and choose and do what I wanted to do, that by the end of the day they had to have my answer, my decision.

Dkt. No. 21-5 at 63:15-19. Kingsolver left the office to speak with her husband and did not meet the deadline. Dkt. No. 21-5 at 63:20-24. Reed was in Kingsolver's office the following morning demanding an immediate answer: "What are you going to do? Are you going to take the demotion or are you going to stay in budget?" Kingsolver said she would take the demotion: "I mean, what other choice do I have here?" Dkt. No. 21-5 at 64:2-20.  "I was barely hanging on. I was hanging by a thread…. It just broke me. I broke… I … had to listen to [Dr. Jones]. It's your health or the job.…". Reed's and Brandon's rejection of Kingsolver's requests and failure to offer alternatives had severe effects: "I felt – I mean I had no self-esteem. I was demoralized. I was just – I was broken. I was literally drowning." Dkt. No. 21-5 at 67:1-19.

Reed dictated an addition to the request form Kingsolver had submitted October 1: "As of 10/10/07 I will accept another program area position comparable

to the management assistant position that I previously held", *i.e.,* a GS-7 position. Dkt. No 21-5 at 64:25-65:23; Dkt. No. 21-14.

Kingsolver met with Reed and Brandon once more on October 19 to learn that the demotion had gone through: Brandon told her that she was "now Management Assistant GS-7." Kingsolver smiled and hugged Brandon as expressions of "thankfulness that I wasn't going to die of a heart attack in budget." Dkt. No. 21-5 at 68:9-69:4. Brandon then handed her a DOJ Form 100B (Reasonable Accommodation Information Reporting Form) which acknowledged her October 1 request but effectively denied it as untimely submitted: "This information was provided to the employee on July 18th, but the employee did not return the form until October 1st." Dkt. No. 21-5 at 66:11-15. Consistent with Brandon's entry on the Form 100B, Kingsolver's demotion was processed not as a reasonable accommodation, but a personnel action "at employee's request." Dkt. No. 21-15.

On October 30, Kingsolver met with Reed regarding her Performance Appraisal for the 2006-2007 fiscal year. Despite having worked successfully under extreme stress, for the first time, Kingsolver was rated less than "outstanding", rather "highly successful." There were no specific criticisms of Kingsolver's performance in the review; Reed explained the lower rating was a recognition that she was being evaluated for the first time as a GS-9. Dkt. No. 23-1 at 56-57. Reed and Brandon both ignored the impact of her depression and cardiac arrythmia. According to Reed,

> [Kingsolver's] rating could have improved by being more proactive and positive toward the day to day challenges of the job, attending extra training assignments which would broaden her knowledge base, confidence and allow her to take on more challenging work…

Dkt. No. 23-1 at 60. Brandon's judgment was even harsher: "She could have embraced her job and learned some coping skills in dealing with FReD." Dkt. No. 23-1 at 69.  Believing that the lower performance rating was retaliation for her having requested accommodation and that she had been forced to accept a demotion, Kingsolver contacted the EEO Office on November 11, 2007. Dkt. No. 23-1 at 15-16.

The EEOC's sixteen-year administrative review of Kingsolver's complaint involved two factual hearings resulting in awards in her favor; ultimately however the EEOC dismissed her complaint, finally issuing a right to sue letter on February 22, 2023. Kingsolver timely filed this suit alleging discrimination under the Rehab Act. Dkt. No. 1. Both parties moved for summary judgment and, on December 30, 2024, the District Court granted the Agency's motion and denied Kingsolver's motion. Dkt. No. 33. Kingsolver appeals this Order.

The standard of review for a grant of summary judgment is *de novo. Adams v. Poag,* 61 F.3d 1537, 1542 (11th Cir. 1995). Summary judgment should only be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In seeking summary

13

judgment, the Agency "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Kingsolver, as the party opposing summary judgment, "must set forth specific facts showing that there is a genuine issue for trial." *Walker v. Darby,* 911 F.2d 1573, 1576-77 (11th Cir. 1990). The Court views the record evidence "in the light most favorable to" Kingsolver. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) and will draw all justifiable inferences in Kingsolver's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## SUMMARY OF THE ARGUMENT

Plaintiff Annette Kingsolver, who suffers from depression and cardiac arrhythmia brought on by stress, made at least five different requests for accommodation over a five-month period: for leave without pay (LWOP), a lateral transfer at the GS-9 level, or any suggestion that would help. Supervisors Reed and Brandon, who were entirely ignorant of the request process and believed that Kingsolver was trying to manipulate it, denied her request for LWOP because of a nonexistent rule, denied lateral transfer because a one-time search did not reveal any

14

vacancies at the GS-9 level, and never offered any accommodation other than demotion to a GS-7 position. The supervisors met only one requirement of the Agency's request process: they provided her with a request form some three months after her first request. Throughout this time period, Kingsolver's conditions worsened dramatically; although she accomplished all her work responsibilities, her physician warned her that she was a candidate for a heart attack if her employer did not reduce her stress. Kingsolver submitted the request form for a lateral transfer to her supervisor on October 1; instead of a response to her request, she received an email assigning her greater responsibilities which would have added to her stress. Kingsolver was given less than twenty-four hours to choose between staying in her position with the additional stress, exhausting her paid leave, or taking the demotion. She agreed to the demotion, her request form was unlawfully rejected as untimely, and her demotion was described as voluntary.

The trial court's finding that the denials of Kingsolver's earlier requests were time-barred by C.F.R. § 1614.105(a)(1) completely ignores the provision of section 1614.105(a)(2) that an extension shall be granted where the employee is not informed of the time limit. Since the issue of timeliness was never raised during the sixteen-year administrative review, the trial court erred in refusing to consider these denials.

15

Equitable tolling should apply to these earlier denials based on the failures of Reed and Brandon to know and follow the Agency's request process, their lack of good faith in considering Kingsolver's requests, and their misrepresentations concerning the availability of leave without pay as an accommodation. The trial court's refusal to apply equitable tolling is based on its misconception that Kingsolver failed to meet a deadline for submission of the request form, when there is no such deadline, and cannot be sustained.

Kingsolver's demotion was not voluntary under the precedent of *Hargray v. City of Hallendale,* 57 F.3d 1560, 1568 (11th Cir. 1995) because she was forced to choose between staying on the job with the newly-imposed responsibilities or taking the demotion, she was not allowed to determine the date of the demotion, she was given less than 24 hours to make the decision, and she made it based on the misrepresentation that she could not take leave without pay. The trial court's characterization of Kingsolver's leave request as one for "indefinite leave" is incorrect, both factually and legally, and is not sustainable.

The trial court's grant of summary judgment is based on disputed facts and mistakes of law; therefore, Kingsolver is entitled to a jury trial.

## ARGUMENT AND CITATION TO AUTHORITY

The Rehabilitation Act, 29 U.S.C. § 791, places an affirmative duty on the Agency to reasonably accommodate a qualified individual with a disability unless

16

accommodation would place an undue burden on the Agency. Consistent with this duty and the requirements of 29 C.F.R. § 1614.10, the Department of Justice ("DOJ") has promulgated its *Manual and Procedures for Providing Reasonable Accommodation* ("DOJ Manual"), which provides supervisory employees with specific mandatory instructions for responding to a disabled employee's request for reasonable accommodation. Dkt. No. 23-1 at 102-112. It is undisputed that Kingsolver's supervisors, Abra Lattany-Reed ("Reed") and Thomas Brandon ("Brandon") never consulted the DOJ Manual and did not act in accordance with its procedures. It is also undisputed that neither Reed nor Brandon took Kingsolver's requests seriously and misrepresented, at a minimum, that her requested leave without pay ("LWOP") was not available as a reasonable accommodation. Despite the Agency's admitted animus and utter failures to follow the law, the trial court granted summary judgment to the Agency on Kingsolver's Rehab Act claim, finding that denials of her requests were time-barred because Kingsolver failed to follow the request procedures and that her demotion was voluntary and thus not discriminatory.

Kingsolver respectfully requests that the erroneous order granting summary judgment be reversed and the matter remanded for the jury trial to which she is entitled.

I.　**Kingsolver's claims regarding the Agency's Failure to Grant Her Requests for Reasonable Accommodation are not Time-barred Because of the Agency's Admitted Refusal to Take Her Requests**

**Seriously, its Refusal to Comply with the DOJ's Reasonable Accommodation Procedure, and its Effective Misrepresentation of the Procedure's Time Requirements.**

The trial court held that Kingsolver's EEOC training, which included the requirement of C.F.R. § 1614.105(a)(1) that she report any claim to the EEO within 45 days, placed the burden of meeting the requirement solely on her. The trial court found that the pre-October 2 denials were time barred. The court also refused to apply equitable tolling to those claims because it found that Reed and Brandon fully complied with the request procedure. These erroneous conclusions should be reversed.

**A.    Kingsolver's pre-October 1 requests are not time-barred.**

Finding [incorrectly] that Kingsolver's first contact with EEO was on November 16,[4] the trial court counted 45 days from that date to rule any claims prior to October 2 time-barred. The court's invocation of the Supreme Court rule that "[t]he limitations-period is always conducted claim by claim," *Green v. Brennan,* 578 U.S. 547, 563 (2016), led to its conclusion that this Court rejects the continuing violation doctrine in ADA cases where each "failure to grant her requested accommodations involved discrete acts of alleged discrimination," *citing Abram v. Fulton Cnty. Gov't,* 598 F. App'x 672, 676 (11th Cir. 2015) and trial court orders in

---

[4] The EEO Counselor's Report states that Kingsolver made the first contact on November 11, 2007. Dkt. No, 23-1 at 16.

18

this Circuit. Thus, the court reasoned, Kingsolver had the obligation to reach out to the EEO office within 45 days of each denial and the court can now reject all those claims.

The trial court's reliance on *Abram* is misplaced, both factually and procedurally. In *Abram,* the plaintiff filed suit based on a denial of telework in 2009; the claim for that specific denial had been properly filed and processed by the EEOC, and plaintiff timely filed her ADA complaint after receipt of a right to sue letter. 598 F. App'x 672, 675-676.  The federal complaint was not however limited to the 2009 denial that was the subject of the right to sue letter. Rather, it included several other denial claims, dating back to 2006; some were never presented to the EEOC, and others were presented to and processed by the EEOC but the plaintiff had not filed a timely complaint. *Id.* The district court found that the plaintiff's failure to comply with the ADA's statute of limitations for discrimination claims rendered the other claims time-barred. This Court agreed, and also found that the plaintiff's failure to follow the statutory proscriptions for the earlier ADA claims rendered her ineligible for equitable tolling. *Id.* at 674-676. The *Abram* case and others cited by the court analyzed only the statutory requirements of filing a complaint with the EEOC within 180 days of a discriminatory act and filing a federal complaint within 90 days of receiving the EEOC's right to sue letter. It is undisputed that Kingsolver timely filed her Complaint in this case.

19

The federal rule regarding the 45-day limitation is quite different:

> (a) Aggrieved persons who believe they have been discriminated against on the basis of … disability … must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.
>
> (1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.
>
> (2) The agency or the Commission shall extend the 45-day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a). It is undisputed that Kingsolver was not notified of the 45-day limit; the court bootstrapped the mention of the 45-day deadline in her EEOC training to insist that Kingsolver was not eligible for tolling.[5] Because subsection (2) *requires* the Agency or EEOC to extend the deadline and neither the Agency nor the Commission raised the timeliness issue in the sixteen years of administrative review, suggests that one of both extended the deadline.

---

[5] The PowerPoint presentation on the 45-day deadline was submitted by the Agency as Dkt. No. 23-1. The specific slide reads "If you feel that you have been a victim of discrimination or retaliation, you may wish to contact an EEO officer or counselor for your agency within 45 days", hardly the assertion of a mandatory deadline. Dkt. No. 23-1 at 43.

Only two of the cases cited by the trial court rejected specific claims outside the 45-day limitation; in both cases, the employer argued timeliness throughout the administrative and court proceedings. *Mullin v. Sec'y, Dept of Veterans Affs.,* 2022 WL 2159721 (M.D. Fla. June 15, 2022) (rejected claims were granted accommodations request of air purifier and three days in the office per week, which the complainant complained were inadequate); *Tarmas v. Mabus*, 2010 WL 3746636 (M.D. Fla. Sep. 21, 2010), *aff'd Tarmas v. Sec'y, U.S. Navy,* 433 F. App'x 754 (11th Cir. 2011) (per curiam) (rejected claims were arbitrary call-in and leave slip requirements, a granted accommodation request that the complainant claimed was inadequate, and blocked transfers). It is notable that in both of these cases, accommodations had been granted by the employer. Neither involved inaction in response to repeated requests for accommodation that were never taken seriously. The application of the C.F.R. § 1614.105(a) and the "discrete act" doctrine should not render Kingsolver's earlier claims time-barred.

B.     **Equitable tolling should be applied** i**n this case.**

Even if the earlier denials were time-barred, equitable principles demand that they nonetheless be considered. Where, as here, the Agency makes the argument that the plaintiff's claim is barred because of failure to follow the administrative accommodation procedure, this Court's ruling in *Wilson v. Sec'y, Dep't of Veterans Affs.,* No. 20-10799, 2022 WL 1907863 (11th Cir. June 3, 2022), is the applicable

precedent. Pamela Wilson, a veteran who suffered from degenerative disc disease and partial paralysis in both feet, was a probationary Veteran Claims Examiner (VCE) for the Atlanta VA Regional Office. *Id.* at *1. Probationary VCE's were generally required to park at an offsite parking deck a mile away. Because of her mobility issues, Wilson "effectively faced the option of either walking to work – which 'put enormous pressure on her nerves' and caused her legs and feet to swell – or parking in unassigned handicapped spaces in the onsite parking deck" normally reserved for permanent employees. *Id.* Wilson chose to park onsite, "leading to numerous parking tickets and counseling memos about her unauthorized parking." *Id.*

This Court provided a detailed description of Wilson's accommodation requests, strikingly similar to Kingsolver's experience with ATF:

- On March 31, in response to Wilson's first request, Vocational Rehabilitation Coordinator Chapin, to whom Wilson had been referred, told Wilson she would make a workplace accommodation request to Human Resources; there was no follow up. *Id.* at *2.

- On April 13, Wilson met with her direct supervisor White after receiving a counseling memo for unauthorized parking. Wilson explained that she was working with Chapin to get permission to park onsite to accommodate her disability and asked for White's assistance. White said she would

communicate with Chapin, but did not do so, and did not follow up with Wilson. *Id.*

- On April 21, Wilson emailed an HR assistant asking for paperwork for a parking accommodation request. The assistant responded that she had forwarded the email to the "appropriate person", but Wilson heard nothing. That same day, Wilson emailed Chapin to confirm the status of her request; Chapin said she thought Wilson had dropped the matter, but asked for her supervisor's name so that Chapin could request an assessment. Wilson supplied the requested information. *Id.*

- On May 12, Wilson met with Chapin; Chapin reminded Wilson to discuss her request with White.  *Id.*

- On July 1, union representative Manning gave Wilson her own parking badge with permission for Wilson to park on the onsite deck. The badge did not work, and Wilson asked HR liaison DeLoach for help. On July 7, 2009, DeLoach informed Wilson that she was not authorized to park there.  *Id.*

- On July 8, Wilson emailed DeLoach to request "the appropriate paperwork to file for reasonable parking accommodations due to my service-connected disability, … degenerative disc disease, with [herniated] discs and partial paralysis in both of [her] feet." *Id.* On July 16, Wilson's new direct supervisor Smith told Wilson that he and HR "d[id] not see a connection [between

23

parking privileges] and the essential function of you performing your job." *Id.* Wilson emailed DeLoach for written confirmation that Smith had denied her request; in a follow-up email, Smith reiterated that neither he nor HR saw the need for an accommodation but did not deny the request outright. DeLoach said she would assist Smith in helping Wilson understand how to properly submit a request. *Id.*

- On July 22, Wilson filed a complaint with the EEOC alleging discrimination based on the denial of her requests. Within hours, she received a letter from Smith titled "Certification of Need for a Reasonable Accommodation", thereby acknowledging the accommodation request and asking for medical documentation. In that same letter, Smith reminded Wilson that "parking is not a condition of employment, nor related to the essential functions of your position." *Id.* at *3.

On September 3, Wilson withdrew her EEOC complaint after her EEOC counselor advised her that DeLoach had said "if [parking] was going to be a problem [Wilson] might want to reevaluate her decision to work there." *Id.* Wilson continued to park in onsite handicapped spaces and amassed more parking tickets and counseling memos. She received a negative performance appraisal, and the VA terminated her employment on December 18, citing both her parking violations and poor performance as justification.

24

The trial court granted summary judgment to the VA on the grounds that Wilson's requests before the July 8 email were insufficient according to the VA's reasonable accommodations policy[6] and that Wilson thwarted the interactive process by failing to provide the medical documentation requested on July 22. This Court reversed on both grounds, concluding that "[a] jury could reasonably find that the VA's four-month-long inaction in addressing Wilson's request constitutes a failure to accommodate in violation of its obligations under the Rehabilitation Act, regardless of Wilson's subsequent failure to provide the documentation." *Id* at *6.

Kingsolver acknowledges that the administrative filing deadline was not specifically raised by the VA in the *Wilson* case even though at least four of Wilson's requests occurred before June 7, 45 days before Wilson's filing on July 22. The VA argued, as the Agency did below, that Wilson's earlier conversations with VA management were not proper requests for accommodation under its procedures. This Court rejected the conclusion that an employee's alleged procedural errors bar consideration of her claims, especially where the employer itself did not follow procedure; it effectively applied equitable principles such as for tolling and the

---

[6] It should be noted that, like the VA in *Wilson*, the Agency in its motion for summary judgment argued extensively that Kingsolver's communication in each of the meetings from April to August were not proper requests for accommodation. Dkt. No. 21 at 12-24. The trial court apparently rejected that argument, finding only that Kingsolver did not file with the EEOC within 45 days of each denial. Dkt. No. 33 at 10-14.

"clean hands" doctrine, *i.e.,* where the Agency ignores its own procedure, it cannot benefit from the employee's failure to follow it – especially when the employee's mistake is a consequence of the Agency's disregard.

As in *Wilson,* a mechanical application of the EEOC administrative filing deadline to deny Kingsolver's claim is unacceptable in light of Reed's and Brandon's consistent failures to follow the letter and spirit of the Rehab Act and the DOJ Manual. The court correctly noted that "equitable tolling typically requires some affirmative misconduct, such as fraud, misinformation or deliberate concealment." *Horsley v. Univ. of Ala.,* 564 Fed. App'x 1006, 1009 (11th Cir. 2014). There is ample evidence in the record that should meet the *Horsley* requirement as well as the spirit of the CFR extension:

First. Reed and Brandon were completely ignorant regarding their responsibilities under the Rehab Act; they did not know of the existence of the DOJ Manual and did not bother to educate themselves or each other regarding the proper response to Kingsolver's requests. Both admitted that they did not know that there was an Accommodation Coordinator and did not know who that was. They did not learn about the request form until July 19, nearly three months after Kingsolver first informed them of her condition, and they certainly did not inform Kingsolver of her procedural obligations because they had no idea what they were.

Second. Even if they were aware of their responsibilities, Reed and Brandon did not consider Kingsolver's requests in good faith. Brandon admitted that he didn't trust Kingsolver's motives: he focused on the lateral transfer request and effectively accused Kingsolver of dissembling about the effect of FReD on her physical and mental conditions so she could take her newly acquired GS-9 out of the budget office and no longer be supervised by the African American Reed. Brandon's and Reed's actions throughout the process are more consistent with this motivation than a genuine attempt to find an accommodation for Kingsolver: the failure to notify EEO or HR of Kingsolver's request even after they received physician letters; Brandon's demand for a list of FReD "stressors" and his complete lack of consideration of it; the imposition of additional responsibilities after Kingsolver submitted the request form noting work stress, and the like. Indeed, both Reed and Brandon insisted Kingsolver should have "been more proactive and positive toward the day-to-day challenges of her job", attended "extra training assignments that would broaden her knowledge base, confidence and allow her to take on more challenging work", "learned some coping skills", and just "embraced her job", the job she had been doing in an outstanding fashion for at least three years prior to their supervising her. Dkt. No. 23-1 at 1733, 1743.

Third. Brandon and Reed repeatedly denied Kingsolver's request for LWOP by misrepresenting that it was unavailable to her unless she first exhausted her

27

accrued vacation and sick leave. Brandon testified that it had always been his "practice" to require exhaustion of paid leave before granting LWOP, Dkt. No.21-5 at 332:24-333:17, but the Agency failed to produce any rule embodying this "practice". In fact, "extended leave" is one of the three suggested accommodations for "mental or psychiatric illness such as major depression or panic disorders" in the DOJ Manual.[7] Dkt. No. 23-1 at 1780.

Fourth. When Brandon and Reed provided Kingsolver with a request form for the first time in their July 19 meeting, they did not provide her with a copy of the DOJ Manual (because they didn't know it existed) and did not explain the procedure or any time limits to her. In fact, there is no specific time frame for filing a request form once it is provided. In any event, Brandon confirmed to Kingsolver that there would likely be new GS-9 positions at FLETC effective October 1 and that Kingsolver could apply. On August 16, Kingsolver specifically stated that she was holding off on filing the request form in the hope that she would be eligible for one of these positions. Brandon's response was, "Okay. Do that." Dkt. No. 21-5 at 335:23; 50:4-51:16. Even if there were a submission deadline, Brandon's knowledge

---

[7] According to the trial court, Kingsolver asserts that she was seeking FMLA leave; the court rejected any such claim because Kingsolver never formally applied for FMLA leave and cannot assert a FMLA claim in a disability discrimination case. *See* Dkt. No. 33 at 24-25. Nonetheless, the court noted that the FMLA allows the employer to impose this exhaustion requirement for leave granted under that statute. 29 U.S.C. § 2612 (d)(2). Dkt. No. 33 at 25, n. 12. Because this case does not include a FMLA claim, this reference is confusing and should be disregarded. ***See infra* at**

of and acquiescence with Kingsolver's plan to delay submission of the form effectively granted her an extension of time to file.

Fifth. Two days after Kingsolver submitted the request form, she received an email from Reed which assigned her more responsibilities that were being performed by GS-12 employees. Reed told her that Brandon had determined that because she had been promoted to GS-9 without any increase in responsibility, she should have additional duties consistent with the promotion. Dkt. No. 23-5 at 50:4-51:16.

The trial court held that "the undisputed facts" contradict Kingsolver's argument for equitable tolling. The court ignored some of Reed and Brandon's actions and praised others; according to the trial court, Reed and Brandon "continually met with her… moved her to an office with a window… gave her the [request form] months before she submitted it,[8] and kept her apprised of the lack of a vacant position for a lateral transfer", and that these acts constituted the required "interactive process" in the DOJ Manual. Dkt. No. 33 at 15.

The trial court's rejection of equitable tolling has no basis in law or in fact:

> Plaintiff has not shown that the circumstances that delayed *her submission of the DOJ 100a form until October 2007* were beyond

---

[8] The trial court specifically found that giving Kingsolver the request form demonstrated Reed's and Brandon's knowledge of the processing of accommodations requests, as the DOJ Manual provides that the form is the "first step" in the request process. Kingsolver respectfully notes that the provision of this form is the *only* action taken by Reed and Brandon that is consistent with the request process. Demonstrating his total lack of knowledge, Brandon ultimately dismissed Kingsolver's request form because it was not timely.

> her control…. Defendants have shown that Plaintiff completed her EEO training, which explained … the 45-day deadline… It is undisputed that Plaintiff *did not submit the DOJ Request form for over two months after her supervisors provided it to her*….”

Dkt. No. 33 at 16 [emphasis added]. The 45-day deadline for contacting an EEO officer has nothing to do with submission of a request form; there is no rule requiring submission of the request form within any period of time. Nonetheless, the trial court was harsh in her criticism of Kingsolver:

> It is undisputed that Plaintiff did not submit the DOJ Form 100A request form for over two months after her supervisors provided it to her. … Plaintiff argues that she delayed submitting the form because she was awaiting new positions to become available for a lateral transfer. This explanation does not warrant the extraordinary remedy of equitable tolling…

The trial court's denial of equitable tolling based on Kingsolver's failure to meet a nonexistent deadline is just plain wrong. Equally untenable is the court's conclusion that Reed's and Brandon's actions satisfied the "interactive process" requirement even though Kingsolver initiated most of the meetings and follow up and all the meetings followed the same script – no lateral transfer, no LWOP, no other ideas; Reed and Brandon admittedly questioned her motives with Brandon speculating that Kingsolver did not want to work under an African American supervisor, putting their good faith in question; Reed and Brandon never contacted anyone in the EEOC or HR offices to report Kingsolver's requests or to learn their responsibilities in the request process; Reed and Brandon never considered the

30

recommended accommodations in the DOJ Manual, and didn't offer Kingsolver any alternatives other than demotion or paid leave; Reed and Brandon repeatedly cited a non-existent exhaustion rule as the basis for their denial of LWOP; and the only accommodation they gave her was an office with a window, something she never requested and from which she was evicted after her demotion. And, when Kingsolver did submit the request form to Reed, it was never forwarded to the Accommodation Coordinator and was denied by Brandon because of her failure to meet the non-existent deadline, and her demotion was treated as a personnel action "at employee's request." Dkt. No. 21-1. The Code of Federal Regulations unequivocally states that "[t]he Federal Government shall be a model employer of individuals with disabilities". 29 C.F.R. § 1614.203(c). It is laughable to suggest that the "interactive process" conducted by Reed and Brandon is a model of anything other than ignorance, neglect, and discrimination.

The Agency does not have "clean hands" with regard to Kingsolver's requests for accommodation and ultimate demotion, and Kingsolver's alleged mistakes should not bar her claim from a jury. As this Court noted in *Wilson*, "[a] jury could reasonably find that the VA's four-month-long inaction in addressing Wilson's request constitutes a failure to accommodate in violation of its obligations under the Rehabilitation Act, regardless of Wilson's subsequent failure to provide the documentation." *Id* at *6. Likewise, a jury could reasonably find that Kingsolver's

31

six-month request odyssey which resulted in her taking a demotion in the face of an increased workload constitutes a failure to accommodate in violation or the ATF's obligations under the Rehabilitation Act, regardless of any procedural mistakes she might have made. Kingsolver respectfully requests that the Court reverse the order granting summary judgment and remand the case for trial.

## II. Kingsolver's Demotion was Not Voluntary Because the Agency Misrepresented the Availability of Leave Without Pay and its Consistently Refused to Follow the DOJ's Accommodations Procedure.

Having adopted the Agency's position that it was Kingsolver who bore responsibility for Reed's and Brandon's procedural failures, the trial court further agreed with the Agency that Kingsolver's demotion was entirely voluntary. The court focused on this Court's analysis in *Hargray v. City of Hallandale,* 57 F.3d 1560 (11th Cir. 1995) (per curiam), which held that an employment action – in this case, Kingsolver's demotion stemming from her October 10 amended request form – is presumed voluntary "unless the employer forces the … demotion 'by coercion or duress,' or the employer obtains the … demotion 'by deceiving or misrepresenting a material fact to the employee.'" Dkt. No. 33 at 18, *quoting Hargray,* 57 F.3d at 1568. The trial court focused on the "coercion or duress" analysis, which looks at five factors:

> (1) Whether the employee was given some alternative to …demotion; (2) whether the employee understood the nature of the choice [s]he was given; (3) whether the employee was given a

32

reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the … demotion; and (5) whether the employee had the advice of counsel.

Dkt. No. 33 at 18-19, *quoting Hargray,* 57 F.3d at 1568. The court acknowledged the "undisputed facts" that Kingsolver met three of the five requirements: she was given less than 24 hours to choose between demotion and staying on the job (which now had more responsibilities reassigned from GS-12 employees), was not able to determine the date of demotion and did not have advice of counsel. Nonetheless, because the court found that Kingsolver was offered the alternatives of paid leave and staying in her job and understood the choice she was given, the demotion was "not involuntary or coerced." Dkt. No. 33 at 19-21. In doing so, the court again positively pointed to Reed's and Brandon's efforts "to keep her apprised of position vacancies, or a lack thereof" and their claim that the short deadline was "due to a meeting with Washington to seek approval of [Kingsolver's] transfer, not for an arbitrary reason to coerce [Kingsolver] into a decision." Dkt. No. 33 at 20. The court ignored the undisputed fact that two days after Kingsolver submitted the request form, Reed and Brandon increased her workload  - and accompanying stress - with more FReD responsibilities at the GS-12 level; Kingsolver was being forced to choose between a workload greater than the one for which she had requested accommodation and a demotion. A reasonable jury might well find that this change

33

in her job duties might constitute an arbitrary action "to coerce [Kingsolver] into a decision."

The district court failed to examine the second issue of voluntariness: whether the Agency "deceived or misrepresented a material fact" to Kingsolver during the process. *Hargray,* 57 F.3d at 1568. A misrepresentation is material if it concerns an alternative to demotion. *Stone v. Univ. of Md. Medical System Corp.,* 855 F.2d 167, 174 (4th Cir. 1988). It is undisputed that Kingsolver requested LWOP as an alternative to transfer from April right up to October 10, and that Reed and Brandon continually misrepresented that it was not available to her because she had accrued paid leave. *See, e.g.,* Dkt. No. 21-5 at 24:25-26; 27:2-14; 27:15-3:16.

Rather than address the LWOP issue as a material misrepresentation, the trial court adopted Agency's position - raised for the first time in its motion for summary judgment - that Kingsolver's request for LWOP constituted a request for "indefinite leave without pay" which the court found "is generally not a reasonable accommodation." Dkt. No. 33 at 23. The characterization of Kingsolver's request as "indefinite leave" and the court's resulting rejection of her claim is not supported by fact or law.

First. The court rejected Kingsolver's contention that she did not request indefinite leave on the sole basis that Kingsolver "does not point to any evidence showing that she requested leave for a specific period of time." Dkt. No. 33 at 23,

*citing* Kingsolver's testimony that she "simply wanted to get away from her job." Dkt. No. 26 at 5. The court ignored other testimony regarding Kingsolver's leave request: "My wish was to go on leave without pay, get myself together, and come back to work." Dkt. No. 23-5 at 2-3. It is significant that the denial of her LWOP requests were never because the length of leave was indefinite; they were always denied because she had accrued paid leave. In the context of all the discussions about her health, the idea of "getting away" was to reduce the work stress and regroup. It is also significant that Kingsolver had no history of illness and requesting leave.

Second. The court cited four cases in which the plaintiff employees were discharged after being out of work for a long period of time and denied indefinite leave, complete different from Kingsolver's situation. *See, Wood v. Green,* 323 F.3d 1309 (11th Cir. 2003) (employee had suffered from cluster headaches for fourteen years and had missed work for several weeks each year); *Duckett v. Dunlop Tire Corp.,* 120 F.3d 1222 (11th Cir. 1997) (employee had suffered from high blood pressure for ten years, had been out of work  and his doctor had not cleared him for return); *Billups v. Emerald Coast Utilities Auth.,* 714 F. App'x 929 (11th Cir. 2017) (employee suffered work injury to his arm requiring surgery, had been out of work for six months, and could not physically perform his job); *Tolbert v. James,* No. 2:13-CV-427-WKW, 2015 WL 2169950 (N.D. Ala. May 8, 2015) (employee had been granted medical leave and sought continual renewals with no indication that

35

she would be able to return to work). These cases demonstrate that the key to determining reasonableness is whether the accommodation will allow the employee to perform the job presently or in the immediate future. If the employee cannot demonstrate that the requested leave will enable the employee to return to work, the request is not for a reasonable accommodation. *See Wood,* 323 F.3d at 1314.

It is untenable to suggest that Kingsolver's request for LWOP is an unreasonable request for indefinite leave. Kingsolver did not have a history of illness and had not taken extended medical leave. Her justification for the leave is exactly what is considered reasonable: she believed that time to get away and regroup would allow her to return to work with FReD without the stress.

The trial court also failed to address the DOJ Manual's recommendation for accommodations for employees with "mental or psychiatric illness such as major depression": "Where an employee provides adequate medical documentation of need, Department supervisors should consider flexible work schedules, the ability to telecommute and *extended leave* as possible reasonable accommodations." Dkt. No. 23-1 at 107. It is impossible to square this recommendation for "extended leave" with the trial court's rejection of Kingsolver's request as unreasonable "indefinite leave".

The trial court further erred in its discussion of FMLA leave. It found incorrectly that "Plaintiff asserts that the leave she was seeking was Family and

Medical Leave Act ("FMLA") disability leave."[9] Dkt. No. 33 at 24. Plaintiff has not made that assertion; as the court noted, she did not plead an FMLA interference claim in the Complaint and never put it a formal FMLA leave request. Dkt. No. 1; No. 33 at 24-25. Nonetheless, the court found that Kingsolver's failure to apply for FMLA leave was fatal to her Rehab Act claim: "no reasonable juror could find in Plaintiff's favor because this 'breakdown' in the reasonable accommodation process was attributable to Plaintiff, not the employer." Dkt. No. 33 at 25, *citing Stewart v. Happy Herman's Cheshire Bridge,* 117 F.3d 1278, 1286 (11th Cir. 1997) (employee held responsible for breakdown in interactive process because she failed to explain her rejection of five different accommodations offered by the employer). It goes without saying *Stewart* is distinguishable: Kingsolver was never offered any accommodation other than a demotion, which she ultimately accepted based on the misrepresentation that she couldn't take LWOP. The court's finding that Kingsolver was responsible for any breakdown in the interactive reasonable accommodations process because she did not apply for FMLA leave is completely at odds with this Court's decision in the *Wilson* case - that four months of inaction in addressing an accommodations request can constitute a failure to accommodate regardless of the employee's failure to submit medical documentation - and cannot be sustained.

---

[9] Kingsolver raised Reed's failure to notify her of her eligibility for FMLA leave in this proceeding as an example of Reed's mishandling of her accommodation requests. Dkt. No. 23.

Further, the trial court's citation to the FMLA provision that allows an employer to require exhaustion of paid leave before granting unpaid leave, 29 U.S.C. § 2612(d)(2)(A), has no bearing on the Reed's and Brandon's misrepresentation that the ATF's non-existent exhaustion requirement prevented him from granting LWOP as an accommodation.

The trial court's finding that Kingsolver voluntarily sought and accepted the demotion is not supported by the law or this record. The trial court ignored a material fact in the record: immediately after Kingsolver submitted the request form about work stress, Brandon and Reed assigned her more above-grade work responsibility. A reasonable jury could conclude that they put Kingsolver in an untenable position by virtue of the additional job responsibilities and the threat that the GS-7 position might not be available, as well as the misrepresentation that she could not take LWOP; faced with these "options" and her physician's concern that she was facing a heart attack, she said to Reed, "I'll take the demotion. I mean what other choice do I have?" Dkt. No. 21-5 at 64:17-18. The trial court's mischaracterization of Kingsolver's leave request as indefinite and therefore unreasonable, as well as its totally baseless findings about FMLA leave, cannot be affirmed. Kingsolver respectfully requests that this Court reverse the trial court's summary judgment order and remand the case for trial.

### III.    Summary Judgment was Improperly Granted.

Summary judgment should be granted only if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  This court has held that "[n]o genuine of material fact exists unless a reasonable jury could return a verdict in favor of the moving party." *Wilson,* 2022 WL 1907863 at \*3 (11th Cir. June 3, 2022), *citing Morton v. Kirkwood,* 707 F.3d 1276, 1784 (11th Cir. 2013).

In this case, as in *Wilson*, a reasonable jury could find that Reed's and Brandon's inaction in processing Kingsolver's over a six-month period constituted a failure to accommodate. A reasonable jury could further find that Reed and Brandon did not engage in a good-faith attempt to find an accommodation for Kingsolver, but rather took actions to "punish" her for a request they believed was manipulative. A reasonable jury could also find that the repeated misrepresentations about the availability of LWOP, along with the assignment of additional duties and the threat that a GS-7 position might not materialize, rendered Kingsolver's demotion involuntary.

The trial court's order effectively gives permission to supervisors to impute improper motives to accommodations requests and therefore refuse to consider them appropriately, ignore the request procedure and refuse to follow it, refuse to educate themselves or the disabled employee on the rules and procedure for reasonable

39

accommodations, deny requested reasonable accommodations based on nonexistent rules, add job responsibilities to a disabled employee who has requested that her work stress be reduced, and beat the applicant down with misrepresentations and threats until she actually requests and accepts a demotion, feeling she has no other choice. This "permission" completely eviscerates that Rehab Act's requirement that the employer grant reasonable accommodations to disabled employees and renders the mandatory interactive process a sham.

There are clearly material facts in dispute, and many of the trial court's conclusions of law, based in part on these disputed facts, render the grant of summary judgment unsustainable. Kingsolver respectfully requests that this Court determine that summary judgment be reversed, and the case remanded for trial.

## CONCLUSION

For the reasons set forth herein, Kingsolver respectfully requests that this court reverse the trial's court grant of summary judgment to the Agency and remand the case to the district court for trial.

Respectfully submitted this the 21st day of May, 2025.

/s/ Mary Helen Moses
Mary Helen Moses
Georgia Bar No. 437900
235 Olive Way
St. Simons Island, GA 31522
maryhelenmoses@gmail.com

/s/ Andrew M. Ruberti
Andrew M. Ruberti
Georgia Bar No. 463231
101 Fraser Street
Hinesville, GA 31313
aruberti@osteenlaw.com

**CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of Fed. R. App. P. 32 (a)(7)(B)(i) because, excluding parts of the document exempted by Fed. R. App. P. 32 (a)(7)(B)(i), this document contains 9950 words.

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed the foregoing Brief of Plaintiff-Appellant via the CM/ECF system which will automatically send a service copy to the following counsel of record:

Channell Singh
Channell.Singh@usdoj.gov

Woelke Leithart
Woelke.Leithart@usdoj.gov

James Stuchell
James.stuchell@usdoj.gov